WILLIAM P. FREEMAN, Respondent, *v.* J. M. BLOOMFIELD, Appellant.

1. *Partnership — Consent — Representation.*—A man cannot be made a partner against his will, by accident, or the conduct of others. He must agree to be a partner, or, as to outsiders, hold himself out as a partner to those who have trusted him as such.

*Appeal from St. Louis Circuit Court.*

*A. H. Bereman,* for appellant.

*Ewing & Holliday,* for respondent.

BLISS, Judge, delivered the opinion of the court.

Defendant is sued as member of the firm of Bloomfield, Ford & Co., late doing business in the city of St. Louis; and plaintiff sets forth separately, stating them in his petition, two grounds of action. First, he charges the firm with proceeds of wine sold for him, and money advanced them as per account filed; and second, for losses and advancements by him, in an adventure in New Orleans, in the purchase of cotton, in which he claims that the firm were his partners.

The defendant raises several questions in relation to the misjoinder of causes of action and non-joinder of parties, which, in our view of the case, it becomes unnecessary to consider. The judgment of the Circuit Court was in favor of the plaintiff upon both counts, though finding separately the amount due upon each. Had it been based alone upon the liability charged in the first branch of the petition, we could not disturb it. The statement, though objected to by the defendant as informal, is sufficient to sustain the judgment, and the evidence clearly establishes that portion of the indebtedness. But the second claim is altogether unsupported by the evidence; and that branch of the case being equitable in its character, the evidence comes before us for examination.

The said firm of Bloomfield, Ford & Co. consisted of defendant Joseph M. Bloomfield, James H. Ford, now deceased, and John Tieman, and they kept a storage and commission house in

St. Louis. In about a month after Mr. Ford became a member of the firm, at the solicitation of General Herron he went with him to New Orleans, having hired a person to take his place in the labor of the house. The next month plaintiff also went below, and, while in company with Ford, went into certain cotton speculations that proved unfortunate. One person was employed to go to Alabama and purchase, and another to Texas, and each was to receive a portion of the profits. They succeeded in spending the money of Ford and the plaintiff, but obtained no cotton. There is much testimony in relation to the conduct of the agents or partners of Freeman and Ford, also in relation to the maneuvers of Tieman, who went to New Orleans after the operations to get back part of Ford's money; but there is not a particle of testimony to show that defendant Bloomfield knew anything of their operations, or ever dreamed that he was plaintiff's partner in the purchase of cotton. The plaintiff was a correspondent of Bloomfield, Ford & Co., solicited consignments of produce and powder for the New Orleans market, and his correspondence with the firm is given in evidence. In not a single letter does he intimate any thing in regard to his cotton operations, nor would any one suspect that he regarded the firm as interested with him.

On a careful reading of the whole testimony, I am at a loss to know on what the judgment of the Circuit Court could have been based. Partnership is a matter of contract. A man cannot be made a partner against his will, by accident, or the conduct of others. He must agree to be a partner, or, as to outsiders, hold himself out as a partner to those who have trusted him as such.

Judge Story best announces the universally conceived law upon the subject, in saying, in section 5 of his work on partnerships, that " it is an established principle of the common law that, as a partnership can commence only by the voluntary contract of the parties, so when it is once formed no third person can be afterward introduced into the firm as a partner without the concurrence of all the parties who compose the original firm. It is not sufficient to constitute the new relation that one or more of the firm shall have assented to his introduction; for the dissent of a single partner will exclude him," etc. If a new partner may not

be introduced into the original firm without the consent of all its members, so much the more should each member be prohibited from associating his copartners with others in an enterprise outside of their legitimate business—in a word, from forming, on behalf of his copartners, an entirely new partnership. The strongest circumstance against the St. Louis firm was the fact that Ford drew upon it for $5,000 on his private account, and, having received assurance that he would shortly replace it, they paid the draft and charged the amount to him personally. This fact tends to rebut rather than raise the presumption of partnership, especially as his necessities for the money had arisen out of the cotton speculation; for, if the other members of the firm were equally interested with him, he would not have been likely to thus shoulder the responsibility himself.

One of these cotton agents positively testifies that the only persons interested in the adventure were himself, Freeman, and Ford, while the other testifies that Ford said that he was acting for his firm, which declaration alone, if actually made, can in no way bind them. The plaintiff doubtless relies upon this declaration of Ford, and also upon his own suppositions in the matter, though they seem to be contradicted by his conduct. He testifies that he inferred from what defendant told him that the house would acquiesce in anything that Ford could engage in, and that Ford agreed that he and the house were to be equal partners.

But was there an agreement on the part of Bloomfield that Ford might engage him or the firm in any speculation he might see fit? Cotton dealing was outside of their business; and if it were not, certainly one partner, without the consent of the other, could have no power to take in new partners, even in their legitimate business. The testimony of the plaintiff upon that subject is this: "I saw Bloomfield perhaps the very day I left for New Orleans. I went in October. Major Bloomfield and I had a talk about the General and Ford. I inferred from that talk that Bloomfield and the house would acquiesce in anything that Ford would engage in. Bloomfield said he had a good thing, and said he wanted me to look after Ford." This was before the plaintiff had met Ford in New Orleans, and before the

cotton speculations were talked of. Bloomfield testifies that in September, 1865, about a month after Ford went into the house, he went to New Orleans with Gen. Herron at his request; that "Ford had no authority to do anything for the house. I never knew of his having any and never gave him any. I mean outside of our business as commission men. He had no authority to purchase or trade in cotton for the house. Freeman (the plaintiff) went to New Orleans in October; a day or so before he left he was at my store; he asked what Ford was doing in New Orleans; told him I did not know; that he was with Gen. Herron. Freeman said, I know he is after something down there, and I am going down, and if I can I will help him along; I said to Freeman, 'for God's sake, don't you do it; if you are a friend of mine, don't get Ford into any speculation.'" He then exhibits the correspondence referred to, in which no allusion is made to Ford or cotton, and says further: "I did not know or learn that he (Ford) was connected with Freeman (plaintiff) in any cotton speculation. Neither he nor plaintiff spoke of it in their correspondence with the house," etc.

John Tieman, partner, testifies that "when Ford went to New Orleans, I think I was not at home; he had no authority from me nor from the firm, so far as I knew, to do anything for the firm while down South. He had no authority to enter into any cotton or other speculation for the house." He says he saw Freeman in New Orleans after the cotton adventure; talked with him often about it; and that he never pretended that the house had any interest in it.

R. A. Tieman, book-keeper, testifies to the same thing in the matter of authority, and says further: "I don't know of his (Ford's) doing anything, or pretending to do anything, for the house, except in a few matters of shipments of the house;" says that they received money from Ford's friends, in Ohio, to replace in part the cash he had drawn out of the firm on his private account; speaks of Freeman's return from New Orleans in the spring, which was after the issue of the cotton adventures; says that he asked for the proceeds of wine sold by the firm for him, which were at once paid him, and a short time afterward

asked for a statement of his account, which was furnished, and which showed the balance due him as stated in the first count of this petition; that he made no objection to the account except as to one or two small items.

There is much other testimony that does not bear directly upon the main inquiry whether Bloomfield ever made any contract of partnership with the plaintiff or authorized Ford to do so. If there was no such contract, or if Ford undertook to bind the defendant without authority, then the plaintiff and defendant were not partners, and the second branch of the case falls to the ground. The mooted question in relation to the effect, in dealing with outsiders, of holding one's self out to them as partners, cannot be raised between the parties themselves, for every one is presumed to know who are his associates in business.

The judgment is reversed and the cause remanded for further proceedings. The other judges concur.